*ace*

**RECEIVED**

LCW

SEP 15 2017

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IRMA ROSAS, individually and on behalf of a class of all persons similarly situated, | ) ) ) ) ) |
| Plaintiff | ) ) ) |
| vs. | ) ) ) |
| GREGORY W. ABBOTT, UNIVERSITY OF TEXAS AT SAN ANTONIO, UNIVERSITY OF TEXAS SYSTEM, NORTH EAST INDEPENDENT SCHOOL DISTRICT, HARLANDALE INDEPENDENT, SCHOOL DISTRICT, TEACHER RETIREMENT SYSTEM OF TEXAS, BILL MILLER'S BAR-B-Q ENTERPRISES, SAN ANTONIO HOUSING AUTHORITY, NRP GROUP, LLC, UNION PACIFIC RAILROAD, BEXAR COUNTY, CITY OF SAN ANTONIO, TEXAS DEPARTMENT OF MOTOR VEHICLES, RITA E. URQUIJO-RUIZ, A-TEX ROOFING, WELLS FARGO & COMPANY BANK, TRINITY UNIVERSITY, AUSTIN INDEPENDENT SCHOOL | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CIVIL ACTION FILE NO.:

# 17 CV 6660
# JUDGE LEINENWEBER
# MAGISTRATE JUDGE KIM

DISTRICT,                                )
TEXAS EDUCATION AGENCY,       )
TEXAS DEPARTMENT OF STATE )
    HEALTH SERVICES,              )
TEXAS RIOGRANDE LEGAL         )
    AID, INC, AND                     )
TEXAS SECRETARY OF STATE    )
                                             )
        Defendants.                  )        CLASS ACTION COMPLAINT
_____ )

## CLASS ACTION COMPLAINT

### Preliminary Statement

1.    Plaintiff Irma Rosas ("Plaintiff") brings this action under §1 of

the Fourteenth Amendment of the United States' Constitution, which states:

> All persons born or naturalized in the United States and subject
> to the jurisdiction thereof, are citizens of the United States and
> of the State wherein they reside. No State shall make or enforce
> any law which shall abridge the privileges or immunities of
> citizens of the United States; nor shall any State deprive any
> person of life, liberty, or property, without due process of law;
> nor deny to any person within its jurisdiction the equal
> protection of the laws.

2.    The Plaintiff alleges that Defendant University of Texas at San

Antonio ("UTSA") discriminated against due to her (1) national origin, (2)

Chicana identity, (3) lesbian identity, (4) working-class status, and (5)

Spanish language identity. The following is the Plaintiff's preliminary

statement on each of the five acts of discrimination. After the Plaintiff

2

contacted the Defendant UTSA in May of 2017, she first learned that the Defendant UTSA had terminated the Plaintiff's financial aid because she was "enrolled less than part-time" during the fall semester of 2012 and was dropped from class for nonpayment.

3.　　The Plaintiff further alleges that she suffered dire consequences as a result of the Defendant UTSA terminating her financial aid. The Plaintiff was (A) left without a source of income, (B) terminated from enrollment at UTSA, (C) forced to request a refund of her accumulated contributions from the Defendant Teacher Retirement System of Texas (D) evicted from her apartment with Defendants San Antonio Housing Authority and NRP Group, LLC, (E) when the Writ of Possession was never posted on the Plaintiff's door by Defendant Bexar County, (F) the Plaintiff "lost" all of her property, including all of her research data, (G) the loss of data compromised the confidentiality of the Plaintiff's personal information, individuals who were connected to her, and her research participants who were children and adults in the afterschool programs at the Martinez Street Women's Center, and (H) forced the Plaintiff to leave her vehicle in San Antonio when she returned to Chicago in 2014.

4.　　Prior to the Plaintiff suffering the consequences A-H above, the Plaintiff was terminated from the Defendant Austin Independent School

3

District (I) where she worked as a bilingual teacher during the 2010-2011 school year. The Plaintiff alleges that during the fall of 2010, she did not heed to requests by administrators at Hart Elementary School ("HES") to violate the rights of low-income Limited English Proficient and Special Education students, and to postpone her surgery. The Plaintiff alleges that administrators began harassing her with the intention of terminating her employment.

5.     The Plaintiff alleges that the administrators at HES gave her a choice to resign or to be terminated. If the Plaintiff did not resign, they warned, the termination would "become part of [her] record." The Plaintiff could not resign; she had recently had surgery and needed health insurance. Since the summer of 2011, the Plaintiff alleges that she sought teaching employment in Bexar County and the entire State of Texas but her efforts were futile.

6.     The Plaintiff alleges that the Defendants violated the 14th Amendment, which is discussed later in this complaint.

## PARTIES

7.     Plaintiff Irma Rosas is a resident of this district.

4

8.　　Defendant Gregory W. Abbott, Governor of Texas, has an address of 300 West 15th Street Austin, TX 78701.

9.　　Defendant University of Texas at San Antonio has an address of One UTSA Circle, Main Building, Suite 4.122, San Antonio, TX, 78249.

10.　　Defendant University of Texas System has an address of 601 Colorado Street, Austin, TX 78701.

11.　　Defendant North East Independent School District has an address of 8961 Tesoro Drive, San Antonio, TX 78217.

12.　　Defendant Harlandale Independent School District has an address of 102 Genevieve, San Antonio, TX 78214.

13.　　Defendant Teachers Retirement System of Texas has an address of 1000 Red River Street, Austin, TX 78701.

14.　　Defendant Bill Miller Bar-B-Q Enterprises has an address of 430 South Santa Rosa Avenue, San Antonio, TX 78207.

15.　　Defendant NRP Group, LLC has an address of 5309 Transportation Boulevard, Cleveland, OH 44125.

16.　　Defendant Union Pacific Railroad has an address of 1400 Douglas Street, Omaha, NE 68179.

17.　　Defendant San Antonio Housing Authority has an address of 818 South Flores Street, San Antonio, TX 78204.

18.     Defendant Bexar County has an address of 101 West Nueva, 10th Floor, San Antonio, TX 78205.

19.     Defendant City of San Antonio has an address of 100 Military Plaza, San Antonio, TX 78205.

20.     Defendant Texas Department of Motor Vehicles has an address of 4000 Jackson Avenue, Austin, TX 78731.

21.     Defendant Rita E. Urquijo-Ruiz has an address of One Trinity Place, Northrup Hall 253, San Antonio, TX 78212.

22.     Defendant A-TEX Roofing has an address of 16106 University Oak, San Antonio, TX 78249.

23.     Defendant Wells Fargo & Company has an address of 420 Montgomery Street, San Francisco, CA 94104.

24.     Defendant Trinity University has an address of One Trinity Place, Northrup Hall 440, San Antonio, TX 78212.

25.     Defendant Austin Independent School District has an address of 1111 West Sixth Street, Austin, TX 78703.

26.     Defendant Texas Department of State Health Services has an address of 1100 West 49th Street, Austin, TX 78756.

27.     Defendant Texas Education Agency has an address of 1701 North Congress Avenue, Austin, TX 78701.

28.     Defendant Texas RioGrande Legal Aid Inc. has an address of
301 South Texas Ave, Mercedes, TX 78570.

29.     Defendant Texas Secretary of State has an address of 1100
Congress, Capitol Building, Room 1E.8, Austin, TX 78701.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to the Class
Action Fairness Act of 2005 ("CAFA") codified as 28 U.S.C.
§1332(d)(2)(A-C). The matter in controversy exceeds $5,000,000, in the
aggregate, exclusive of interest and costs, as each member of the proposed
Class of at least tens of thousands is entitled to compensatory and punitive
damages under 42 U.S.C. §1983 for violations of their constitutional rights.
Further, the Plaintiff alleges a national class, which will result in at least one
Class member from a different state.

31.     The Court has subject matter jurisdiction under 28 U.S.C. §
1331 because the Plaintiff's claims arise under federal law.

32.     Venue is proper under 28 U.S.C. § 1391(c)(1) because the
Plaintiff is a resident of this district.

## 14th AMENDMENT BACKGROUND

33.    After the American Civil War, President Abraham Lincoln issued the Emancipation Proclamation on January 1, 1863. The Proclamation freed African slaves in the designated areas of the South and the State of Texas was one such area. However, the State of Texas was slow to carry out the Proclamation. It took an additional two and a half years to finally free its slaves, occurring on June 19, 1865.

Despite the Emancipation Proclamation, the State of Texas and other designated areas of the South continued to resist by actively passing laws that restricted the rights of former slaves. The purpose of the Fourteenth Amendment to the U.S. Constitution ("14th Amendment") was to extend the liberties and rights of the Bill of Rights to former slaves. The State of Texas and the other States of the defeated Confederacy were forced to ratify the new amendment in order to regain representation in Congress. The 14th Amendment was passed by Congress on June 13, 1866 and ratified on July 9, 1868. As with the Proclamation, the State of Texas was slow to ratify the 14th Amendment, doing so until February 18, 1870.

The 14th Amendment consists of five sections. Section 1 is the most litigated and it is comprised of four clauses: The Citizenship Clause,

Privileges or Immunities Clause, Due Process Clause, and the Equal Protection Clause.

34.     The <u>Citizenship Clause</u> (Section 1, Clause 1) states: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside".

35.     The <u>Privileges or Immunities Clause</u> (Section 1, Clause 2) reads: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States".

36.     The <u>Due Process Clause</u> (Section 1, Clause 3) states: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law".

37.     The <u>Equal Protection Clause</u> (Section 1, Clause 4) reads: "[N]or deny to any person within its jurisdiction the equal protection of the laws".

38.     The Plaintiff alleges that the Defendants violated §1 of the 14th Amendment.


## **FACTUAL ALLEGATIONS**

39.     The factual allegations to this complaint are structured in seven parts. The first part focuses on the Defendant UTSA and how it

9

discriminated against the Plaintiff due to her national origin, Chicana identity, lesbian identity, working-class status, and Spanish language identity. The second part discusses the refund the Plaintiff requested from the Defendant Teacher Retirement System of Texas. The third part centers on the Plaintiff's eviction by the Defendants San Antonio Housing Authority, NRP Group, LLC, and Bexar County. The fourth part discusses how the eviction negatively compromised the confidentiality of the Plaintiff's personal documents, that of other people connected to her, and that of under-age participants in afterschool programs at the Martinez Street Women's Center.

The fifth part focuses on how the Defendant Texas Department of Motor Vehicles permitted the Defendant Rita E. Urquijo-Ruiz to junk the Plaintiff's vehicle when the Defendant was no longer an "owner" and without notifying the Plaintiff. In the sixth part, the Plaintiff elaborates on her termination as a teacher with the Austin Independent School District. The seventh and final part, the Plaintiff discusses her experience with jury service in Bexar County courts and the training she received to become a Bexar County Deputy Voter Registrar. In the end, the Plaintiff alleges that the five acts of discrimination by the Defendant UTSA were evident wholly or in part in the actions by the Defendants.

Each part is comprised of the Plaintiff's allegations *and* recent inquiries through the Texas Public Information Act ("TPIA"), or otherwise, commencing in May of 2017.

40.    The Plaintiff holds four advanced degrees. The first is a B.A. in Political Science and Spanish. The second is a M.A. in Hispanic Studies; the Plaintiff's area of study is Linguistics and her specialization is Applied Linguistics. The third degree is a M.Ed. in Instructional Leadership - Educational Studies; the Plaintiff's area of study is Elementary Education with a specialization in Bilingual Education (Spanish) and English as a Second Language ("ESL"). While the Plaintiff did not complete the dissertation to her Ph.D., the Plaintiff holds an "All But Dissertation" (A.B.D.) in Bicultural and Bilingual Studies. This is her fourth "degree."

The Plaintiff was a fully certified bilingual teacher in Illinois (2004-?) and Texas (2004-2016). She has teaching experience in bilingual, ESL, and dual language programs in elementary, middle school, and high school settings in Illinois and Texas. She also has teaching experience at the university level in Illinois and Texas.

Part I

41.    The Defendant UTSA is part of the University of Texas System ("system"). The system encompasses 14 educational institutions and six health institutions. To date, four of the institutions are designated Hispanic-serving Institutions and UTSA is one of them.

42.    The first act of discrimination by the Defendant UTSA stems from the Plaintiff's national origin. Both of the Plaintiff's parents were born in Guanajuato, México, the birthplace for Mexican independence from Spain. Her paternal grandfather was, until his death, a political activist in his hometown in the State of Guanajuato. The Plaintiff asserts that she inherited her activism from her grandfather. Her parents, nonetheless, still had great influence in the Plaintiff's ability to "read the world" around her, to distinguish between fact, fiction, and illusion.

43.    Both of the Plaintiff's parents became legal U.S. residents in 1975; her late father became a naturalized U.S. citizen in 1996.

44.    The Plaintiff was born in the "Land of Lincoln" and is therefore a U.S. citizen. The Plaintiff claims that the Defendant UTSA discriminated against her because she was a U.S. citizen. Defendant UTSA provided the majority of the financial and academic support to international and immigrant students. The Plaintiff alleges that international and immigrant

12

students from China, India, Brazil, Taiwan, South Korea, Cambodia, Indonesia, Latvia, Jordan, Peru, Colombia, and Mexico received preference for work opportunities until they received their degrees or until they were hired at other institutions. The Plaintiff further alleges that many international and immigrant students did not demonstrate a command of oral and written English to write their dissertations and received preference for academic support from professors.

45. The Plaintiff resided in Chicago from her birth until 2004, when she reluctantly moved to the Republican-controlled State of Texas.

46. The second act of discrimination by the Defendant UTSA stems from the Plaintiff's Chicana identity. A "Chicana" is usually a Mexican-origin woman born in the United States. It contrasts from a "Mexican American" identity only in that a Chicana/o is more prone to assert a politically-conscious way of life. While a doctoral student, the Plaintiff was discriminated for claiming a Chicana identity. One example, the Plaintiff alleges, was when Dr. Ellen Riojas-Clark, ("ER-C") a Professor in the Department of Bicultural and Bilingual Studies ("BBL") said, "Chicana, what's that?" after the Plaintiff verbalized her identity in class and in front of her peers. The Plaintiff alleges that ER-C made the question using a

disparaging tone. Immediately following, the Plaintiff further alleges, ER-C asserted, "Mexican American, you're Mexican American."

47. On another occasion, the Plaintiff alleges that she also said that she would be drawing on an Anzaldúan theoretical framework for her dissertation. The late Gloria E. Anzaldúa was a Chicana, lesbian cultural theorist. When the Plaintiff made the comment in class, the Plaintiff alleges that ER-C replied, "she's [Anzaldúa] not a theorist." The Plaintiff never took another class with ER-C.

48. A second example occurred in March of 2008 during the American Education Research Association ("AERA") Conference in New York, NY. The Plaintiff and her then-advisor Dr. Lucila Ek ("LE") were scheduled to co-present the Plaintiff's research and they met in LE's hotel room to prepare the presentation. Once there, the Plaintiff alleges that LE told her that society was structured by "power differentials" and that the Plaintiff had to be "submissive." Puzzled by what she was hearing, the Plaintiff asked LE for clarification. The Plaintiff alleges that LE repeated that the Plaintiff had to be "submissive." Offended, the Plaintiff removed LE as her advisor.

49. Related to this second act of discrimination is, as alleged by the Plaintiff, that the Defendant UTSA also provided the majority of the

financial support to Anglo/Caucasian students until they received their degrees or until they were hired at other institutions. These students were neither bicultural nor bilingual and received preference for academic support by professors.

50.     Dr. Josephine Méndez-Negrete (Professor) and Dr. Marie A. Miranda ("MAM") (Associate Professor) were two senior professors in the "Department of Mexican American Studies" at UTSA. Both professors identified as Chicanas. The Plaintiff alleges that one day she asked MAM, her dissertation chair, why the department was not called the "Department of Chicana/o Studies" instead. The Plaintiff further alleges that MAM replied, "the University [UTSA] doesn't allow it."

51.     To date, Dr. Armando Trujillo in BBL has not been promoted to full professor.

52.     The Plaintiff further alleges that Dr. Elizabeth de la Portilla and Dr. Patricia Quijada, two assistant professors who identified as Chicanas, did not receive tenure and promotion to associate professors in the College of Education and Human Development.

53.     The third act of discrimination by the Defendant UTSA stems from the Plaintiff's lesbian way of life. She was in a long-term relationship with her then-partner, Defendant Rita E. Urquijo-Ruiz, who also identified

as Chicana. To this day, the State of Texas continues to discriminate against members of the LGBTQ community.

54.     The Plaintiff alleges that she was discriminated against because she was, until 2010, in a relationship with a woman of Mexican-origin. The Defendant UTSA provided the majority of the financial and academic support to students who were married to Anglo/Caucasian men. Students who were married to Anglo/Caucasian men received preference for work opportunities until they received their degrees. Moreover, many students who were married to Anglo/Caucasians men received preference for academic support by professors.

55.     The fourth act of discrimination by the Defendant UTSA stems from the Plaintiff's working-class status. In 2006, the Plaintiff resigned from her teaching position with North East Independent School District in order to focus on her doctoral degree on a full-time basis. After the Plaintiff's father unexpectedly died in 2008, the Plaintiff asked the Defendant UTSA if she could be afforded employment with a living wage. The Defendant UTSA denied her request. Then after the Plaintiff and Defendant Rita E. Urquijo-Ruiz separated in 2010, the Plaintiff again asked the Defendant UTSA if she could be afforded employment with a living wage *and* health insurance. Again the Defendant UTSA denied her requests. Both times the Plaintiff

16

retained outside employment as a bilingual teacher, first with Harlandale Independent School District (San Antonio, TX) and then with Austin Independent School District (Austin, TX).

56.     On August 28, 2017, the Plaintiff contacted Sandra Gonzalez and Diana Tudyk with Harlandale Independent School District ("Harlandale ISD") requesting a copy of her personnel file. The Plaintiff alleges that her e-mail was returned. The Plaintiff then used an alternate e-mail and sent the same message. Sandra Gonzalez replied and the Plaintiff explained exactly what she needed from her file. The Plaintiff alleges that she also questioned why one of her e-mail addresses was blocked. The Plaintiff alleges that she has not received her file.

57.     The Plaintiff worked at Harlandale ISD from August 2008 to December 2008. She was hired as a third grade bilingual teacher at Vestal Elementary School. However, she taught 3rd, 4th, 5th grade bilingual reading and language arts. The Plaintiff alleges that she was not certified to teach in that capacity.

58.     Back in September of 2012, the Plaintiff requested copies of contracts between the Defendant Harlandale ISD and Jasmine Engineering Inc. under the TPIA, and her request was denied.

17

59.     On August 31, 2017 and September 5, 2017, the Plaintiff

contacted Leslie Velázquez with the Defendant North East Independent

School District ("NEISD") requesting a copy of her personnel file. The

Plaintiff alleges that she has not received her file.

60.     The Plaintiff worked as an ESL teacher and Dual Language

teacher from 2004-2006 at Colonial Hills Elementary School ("CHES") with

Defendant NEISD. The Plaintiff alleges that she was not certified to teach in

those capacities.

61.     CHES was a campus where low-income LEP and SPED

students were bused to with the intention of segregating them.

62.     During the 2005-2006 school year, the Plaintiff alleges that

Principal Meredith Jenkins ("MJ") informed teachers in a staff meeting that

teachers had to refrain from discussing "the gay lifestyle" in the classroom

because allegedly some parents had complained. The Plaintiff had a 2nd

grade student whose last name was "Gay" and some of her students had been

bullying her about it. The Plaintiff further alleges that just when she had

mustered the courage to use the situation as a "teaching moment," MJ's

directive halted her.

63.     The fifth act of discrimination by the Defendant UTSA stems

from the Plaintiff's Spanish language identity. During the Fall semester of

2007, the Plaintiff took the course "Language and Identity" with Dr. Sonja Lanehart ("SL"), Professor and Brackenridge Endowed Chair in Literature and the Humanities in the Department of English. The Plaintiff learned that SL had docked her final project because one of the components was in the Spanish language and untranslated. The Plaintiff alleges that SL said "why did you [the Plaintiff] include something in Spanish and not translate it into English when you know that I [SL] don't understand it [Spanish]?" The Plaintiff further alleges that SL's question and demeanor indicated that the Plaintiff had "offended" her. The Plaintiff explained that the Spanish language, *untranslated*, was part of her identity.

64.      Related to this fifth act of discrimination was the fact that this "endowed chair" was a monolingual English speaker who taught linguistics classes on African American English at UTSA, a Hispanic-serving Institution ("HSI"). The Plaintiff alleges that this disconnect was equally present in BBL, where the majority of the linguistics professors were neither Hispanic nor spoke Spanish.

65.      The Plaintiff further alleges that no classes in BBL were taught in the Spanish language and no classes were created to teach Spanish as a heritage language. The Plaintiff alleges that she learned of students' abhorrence to taking Spanish classes in the Department of Modern

Languages and Literatures because professors there—most of who were foreign-born—would linguistically terrorize the Spanish that they learned at home and in their communities. The students were preservice bilingual teachers and students in the English department.

66.     The Plaintiff taught a course in BBL for preservice bilingual teachers in the fall semester of 2006. The Plaintiff alleges that many of her students were overwhelmed with the design of the program and considered becoming Generalists instead of Bilingual Generalists because of it.

67.     The Plaintiff alleges that she knows of other students who began the doctoral degree in BBL but who did not complete it.

68.     Due to the statements above, the Plaintiff has decided to file this class action lawsuit.

***

69.     In the summer of 2017, the Plaintiff decided to reapply to law schools. She went online to order her academic transcripts from the Defendant UTSA. The Plaintiff then learned that she had a "hold" on her account and was not able to order her transcripts. The Plaintiff was aware of the fee for the parking citation issued on September 12, 2012; however, she was not aware that there was a $135 fee on her account for the 2012-2013

parking permit. The Plaintiff decided to contact Interim President Pedro Reyes to make her case against the holds on her account.

70. On June 27, 2017 at 10:05 am, Carol González, the Student Ombudsperson in the Office of the Vice President for Student Affairs at UTSA ("SO"), contacted the Plaintiff via e-mail with a timeline of events leading to the fees.

71. On June 27, 2017 at 10:05 am, the Plaintiff alleges that she first learned that Defendant UTSA had terminated her federal student aid because the Plaintiff was "enrolled less than part-time" during the fall semester of 2012.

72. The Plaintiff asked the SO for official documentation, e-mail communication or otherwise, for the timeline presented by the SO.

73. On June 27, 2017 at 4:32 pm, the SO sent the Plaintiff nineteen documents in a PDF file via e-mail.

74. The SO wrote, "*For graduate and doctoral students, a minimum of 4 semester credit hours of enrollment during the fall and spring semesters is required to be eligible for Stafford loan funding*" (emphasis in original).

75. Back in August of 2012, the Plaintiff alleges that she contacted Dr. Patricia Sánchez, the Graduate Advisor of Record ("GAR") in BBL to

ask what class and number of hours she had to register for the approximating

fall semester 2012. The Plaintiff was not sure and she needed the

information so that Margarita Gómez, the Senior Administrative Associate

("SAA") in BBL could give her the call number to register.

76.    A couple of days later, the Plaintiff alleges that the GAR

advised the Plaintiff to register for one hour for either BBL 7311 or BBL

7313. The GAR explained that she did not know what course number the

Plaintiff should register for but assured the Plaintiff that the SAA would

know. The Plaintiff followed the GAR's advice and registered for one credit

hour. This resulted in UTSA terminating the Plaintiff's financial aid and

then dropping her from BBL 7313 weeks later on September 26, 2012.

77.    The previous year on June 21, 2011, the Plaintiff alleges that

Dr. Juliet Langman ("JL"), the GAR at that time, contacted the Plaintiff to

inform her that she had to make an appointment with Dr. Page Smith ("PS"),

Associate Dean in the College of Education and Human Development. PS

wanted to meet with all students who were approaching 99 semester credit

hours of enrollment in doctoral programs to discuss their progress toward

completion of their degree program. The Plaintiff was one such student.

78.    The Plaintiff met with PS on June 29, 2011. At such meeting,

the Plaintiff alleges that she informed PS that she was following the DC's

advise to continue taking classes and independent studies relevant to her research. The Plaintiff also alleges that she informed PS that she felt it was unfair for him to be focusing solely on the number of hours she had and ignoring the fact that she was unemployed and with no access to healthcare. The Plaintiff further alleges that PS replied that he had no control over that and that she had to speak with JL in BBL about her situation.

79.     Then sometime during the spring semester of 2012, the DC informed the Plaintiff that she had not maintained Satisfactory Academic Progress ("SAP") for the evaluation periods of summer semester 2011, fall semester 2011 and/or spring semester 2012. The Defendant UTSA was ready to terminate the Plaintiff's financial aid and consequently her enrollment; however, the GAR and DC assisted the Plaintiff in submitting the SAP appeal paperwork. On June 29, 2012, the appeal was accepted and the Plaintiff was placed on probation with a graduation plan.

80.     On June 29, 2017 the SO stated "Once the email correspondence is sent, a record of the communication type is stored in Banner [software program] which was the screenshot information previously provided to you." The Plaintiff alleges that the Defendant UTSA never notified her that she was not registered for four credit hours and that she was about to be dropped for non-payment because of it.

81. That same day, the SO stated, "Campus Services utilizes a different computer system to track student citations and store related correspondence." According to Defendant UTSA's website, Campus Services includes UTSA Dining, Parking, the 'Runner (shuttle service), UTSA*Card*, the Rowdy Campus Store, and Vending. The SO provided the Plaintiff with copies of the three Parking Citation Notices that were sent to her e-mail and that she received. The Plaintiff alleges that Defendant UTSA used different computer systems deliberately.

82. The SO informed the Plaintiff that she was dropped from class on September 26, 2012. However the Plaintiff alleges that she and the DC continued to schedule their weekly meetings over e-mail, both allegedly unaware that the Plaintiff was not registered for four credit hours and that she had been dropped for non-payment. The last documented meeting between the Plaintiff and the DC occurred on October 18, 2012.

83. The Defendant UTSA has two campuses: the main campus is located at One UTSA Circle, 78249 and the downtown campus is located at 501 West Cesar E. Chavez Boulevard, 78207.

84. The Plaintiff alleges that she informed the DC that she needed office space at the Downtown Campus to complete her dissertation; the Plaintiff could not afford to travel from her home (78207) to the 1604

Campus (78249) on a daily basis. On October 29, 2012, the GAR told her

that it would be impossible to obtain shared office space for more than 4

hours a week since the Downtown Campus had limited office space. The

Plaintiff further alleges that the GAR was also unaware that the Plaintiff was

not registered for four credit hours and that she had been dropped for non-

payment.

85. As of May 17, 2017, the Plaintiff's student loan debt was

$88,988.00. The amount included the primary loans ($55,775.55), interest

($13,793.16), and collection fees ($17,419.82).

86. Because of the Plaintiff's forced default on her federal student

loans, her credit rating was ruined.

87. The Plaintiff alleges that the Defendant UTSA discriminated

against her because of her national origin, Chicana identity, lesbian identity,

working-class status, and Spanish language identity.

88. Due to the statements above, the Plaintiff has decided to file

this class action lawsuit.

\*\*\*

89. On July 25, 2017, the Plaintiff received an unencrypted pdf file

via e-mail from Alejandra Pérez, Supervisor of Records Processing ("SRP")

with the Office of the Registrar. No sensitive information such as the Plaintiff's social security number and birthdate was redacted.

90.     In reviewing the file sent by the SRP, the Plaintiff first learned that the Dissertation Studies Committee in BBL met on October 17, 2013 and decided to deactivate the Plaintiff from their PhD program. The reason was because the Plaintiff had not been active "for 3 consecutive[-]long semesters."

91.     On August 28, 2017, Aaron Faris, Senior Legal Coordinator, responded to one of the Plaintiff's TPIA requests and sent her an unencrypted pdf file via e-mail with her social security number unredacted.

***

92.     Interim President Pedro Reyes never replied to the Plaintiff's complaint sent to him via e-mail on June 23, 2017. The Plaintiff dealt with the SO (student ombudsperson). Prior to 2013, the Defendant UTSA did not have a student ombudsperson.

93.     In regards to the parking permit fee, on June 27, 2017, the SO wrote:

> Without the physical return of the permit, Campus Services does not have a way to ensure that the permit is not being used by the permit holder. In turn, the permit charge of $125.00 remains due.

The Plaintiff was never informed that she had to return the permit. She did

not even know that she was not registered for four credit hours and that she

had been dropped for non-payment because of it.

94.     In regards to the parking permit fee, on June 27, 2017, the SO

wrote:

> Mr. Clay Haverland, Assistant Vice President for Campus
> Services, has granted approval for you to submit a late appeal
> via email to Parking@utsa.edu to include all supporting appeal
> information.

95.     The Plaintiff submitted the photos that Leonardo Amaro,

Customer Service Assistant for Campus Services, sent to her on May 08,

2017.

96.     The Plaintiff resubmitted the explanation for the appeal as

follows:

> On September 12, 2012, I was cited for "blocking a driving
> lane" but if you look at the pictures (see Citation
> Picture_Rosas_1-4) there were no visual markings on the
> asphalt or sign on the fence that clearly marked that fact. Or
> was I to assume that the partial diagonal, white lines mark the
> "driving lane?" If so, then the lines had to extend to include the
> area where I supposedly [was] "block[ing] a driving lane."
> Moreover, the markings that seemed to be on the ground were
> blackened (see Citation Picture_Rosas_1). In the same picture,
> the blue car was parked in front of what seemed to have been a
> white line at some time. This is why I wanted to contest the
> citation.

97. On July 11, 2017, Burt Reynolds ("BR"), Director of Campus

Services, informed the Plaintiff of the appeal decision. The "Citation [was]

upheld but [the] fine [was] reduced."

98. That same day and in the same e-mail, BR explained the

"second level appeal" as follows:

> If you disagree with the result of your first level appeal, you
> may make a Second Level Appeal to the Appeals Panel,
> comprised of faculty, staff, and students. The Appeals Panel
> may uphold the decision, reduce to a lesser violation, reduce to
> a warning, or void the citation. To appeal at this level, you
> must:
> 1. Pay the citation fine
> 2. Submit the Second Level Appeal to Campus Services via
> email: citationappeal@utsa.edu

The Plaintiff could not afford to pay the citation fine.

99. The Plaintiff never received a parking citation in the entire time

she was enrolled at UTSA (August 2006-September 11, 2012).

100. Due to the statements above, the Plaintiff has decided to file

this class action lawsuit.


## Part II

101. On August 01, 2012, the Plaintiff requested a refund of her

accumulated contributions with the Defendant Teacher Retirement System

of Texas ("TRS").

28

102. The Plaintiff received $8,926.66 on August 16, 2012.

103. In order for the Law School Admissions Council to waive the fee for the Law School Admissions Test, the Plaintiff had to verify that she had no source of income in 2015. She requested a Verification of Non-filing for the years 2012, 2013, 2014, and 2015 from the Internal Revenue Service ("IRS").

104. Around April 29, 2017, the Plaintiff received the Verification of Non-filing for the years 2013, 2014, and 2015. The IRS informed the Plaintiff that it could not verify non-filing for tax year 2012 because a return was filed. The IRS enclosed a transcript for 2012.

105. Upon receipt of the transcript for 2012, the Plaintiff first learned that she had an account balance (plus accruals) in the amount of $1,548.23. She made an appointment with the IRS for an explanation.

106. On May 30, 2017, the Plaintiff first learned that the IRS assessed an additional 10% penalty for the early withdrawal of retirement funds in 2012.

107. The Plaintiff requested a copy of the Notice of Final Deposit and Request for Refund from the Defendant TRS and received it around July 24, 2017. The form used by TRS informs the member that "20% of the taxable amount of [your] refund will be withheld for income tax as required

29

by law." However, the form makes no mention whatsoever of the 10%
penalty for the early withdrawal of retirement funds.

108.   Interest continues to accrue on the money owed to the IRS.

109.   Due to the statements above, the Plaintiff has decided to file
this class action lawsuit.

Part III

110.   The Plaintiff alleges that she qualified for housing at San Juan
Square II ("SJSII") in San Antonio, Texas because she was receiving
unemployment benefits from the State of Texas.

111.   The Plaintiff signed the first one-year lease on August 30, 2011.

112.   SJSII is an affordable housing complex co-owned by the
Defendants San Antonio Housing Authority and the NRP Group, LLC, and
managed by the Defendant NRP Group, LLC.

113.   The Plaintiff alleges that SJSII, at least Building 5 where she
lived, was poorly constructed. Each unit only had one entrance/exit. The
trains from the nearby railroad prevented the peaceful enjoyment of the
apartment with the high noise levels and by causing the structure to shake.

114.   SJSII was built in 2006 and about 100 feet away from a highly
transited railroad owned by Defendant Union Pacific Railroad.

115.   The address 2404 S. Calaveras, where the Plaintiff lived, is located in District 5, one of San Antonio's poorest districts. The Plaintiff alleges that she personally experienced being late to appointments because of trains constantly crossing. She further alleges that she witnessed ambulances transporting patients and waiting for trains to finish crossing. The Plaintiff further alleges that the congestion of vehicles, especially semi-trucks, caused by trains crossing contributed to high levels of carbon monoxide.

116.   During her tenancy at SJSII, the Plaintiff alleges that she noticed that maintenance personnel/contractors used the electricity in vacant units. At times, the lights were left on for days. Upon reviewing her electric bills, the Plaintiff discovered that the electricity *used* the first month was significantly higher than that used for the following few months. She attributed the difference to electricity used by maintenance personnel/contractors before she moved into the apartment. The Plaintiff further alleges that she immediately explained the practice at SJSII to the new tenant in unit 5301 so she could record the reading on her meter.

117.   The Plaintiff further alleges that the water flowing from the faucets at SJSII was not water from the Edwards Aquifer, the City of San Antonio's fresh water source.

118.    During her tenancy at SJSII, the Plaintiff traveled to Chicago for the winter holidays. One time she was away from her apartment for over a month's time. She expected her bills for the following month to be nothing or almost nothing. However the Plaintiff alleges that her water bill remained about the same as other months, as though she had not spent the holidays in Chicago. Either the water was not charged on a pay-for-use basis as the Plaintiff was informed would be the case, or someone was using the water in the Plaintiff's apartment when she was in Chicago.

119.    The Plaintiff alleges that management and/or maintenance personnel would enter her apartment when she was not home. On a number of occasions they left notes behind to inform the Plaintiff that they had been in the apartment. The Plaintiff further alleges that these intrusions were non-emergencies.

120.    SJSII was a gated community. However, the Plaintiff alleges that gates functioned properly 10 percent of the time when she was tenant.

121.    The Plaintiff signed the second one-year lease with the Defendants NRP Group, LLC/SJSII and SAHA on June 21, 2012. However, the Plaintiff alleges she signed it under duress from management at SJSII. The Plaintiff alleges that management began harassing her about signing the second one-year lease in early June. The Plaintiff further alleges that each

32

time that she was harassed by management, she informed them that she had

signed the first one-year lease on August 30, 2011 and that she had time

within the 60 days stated in the lease to renew or vacate the apartment. The

Plaintiff further alleges that management gave her the ultimatum that if she

did not sign the second one-year lease immediately, they would presume that

she was vacating the apartment at the end of the lease and rent it to new

tenants.

122. The Plaintiff further alleges that management at SJSII did not

certify her employment/income for the second one-year lease.

123. On June 21, 2012, the Plaintiff alleges that she had no source of

income.

124. Management at SJSII began eviction proceedings in June of

2013.

125. The Plaintiff was summoned to court at Justice of the Peace

Courts, Precinct 1, of Defendant Bexar County located at 3505 Pleasanton

Road, 78221.

126. On August 22, 2017, the Plaintiff contacted Leticia Silva

("LS"), Court Services Supervisor in the Bexar County Clerk's office, to

request copies of all court proceedings in Precinct 1. The Plaintiff alleges

that LS stated that she would send those documents that same day. The

Plaintiff sent a follow-up e-mail on August 28, 2017 because she alleges that she had not received anything. As of the filing of this complaint, the Plaintiff alleges that she has not received the documents.

127. On July 30, 2013, the Plaintiff officially requested a jury trial.

128. The Plaintiff alleges that she visited the Defendant Texas RioGrande Legal Aid Inc.'s San Antonio office and was told that they could not assist her.

129. The Plaintiff missed her next court date on August 10, 2013; she was at University Hospital's Emergency Room since late evening. She had contemplated suicide again. One of the student doctors called the court on the Plaintiff's behalf to inform them that she would not be attending her hearing.

130. On August 27, 2013, a "judgment/jury trial" was entered against her. However, the Plaintiff alleges that she did not receive a jury trial.

131. The Plaintiff appealed the decision on September 3, 2013.

132. The next notice that the Plaintiff received was the summons to Defendant Bexar County, County Court at Law 10, at 100 Dolorosa, San Antonio, Texas 78205.

133. On December 12, 2013, the Plaintiff alleges that she did not receive a jury trial.

134. That day, the Plaintiff further alleges that she tried to explain to Judge Irene Ríos ("IR") that management at SJS renewed her second one-year lease without certifying her income. The Plaintiff represented herself *pro se* and alleges that IR did not allow her to speak about it or anything else.

135. IR signed the Final Judgment on December 12, 2013. The court ordered,

> the principal sum of $4991.00, plus attorneys' fees in the amount of $1000.00, plus costs of court, plus post-judgment interest on the above sums at eighteen percent per annum from the date of judgment until paid.

The Plaintiff alleges that IR stated that the court would order the Writ of Possession after the holidays.

136. The Plaintiff sought a copy of the court transcript for the case at Defendant Bexar County, County Court at Law 10. On July 07, 2017, Court Reporter Brooke Wagner informed the Plaintiff that the transcript was "$310 (Regular Delivery, 2-3 weeks) or $415 (Expedited Delivery, 2-9 Bus. Days)." On July 11, 2017, the Court Reporter claimed that the transcript "is a minimum of 27 pages." The Plaintiff alleges that the proceeding only

lasted for a few minutes and the $310/$415 fee, set by the Court Reporter,

was excessive.

137. On July 20, 2017, Maria Salazar Salinas ("MS"),

Administrative Supervisor, Criminal District Court Administration,

confirmed her conversation on July 12, 2017 with the Plaintiff. MS

confirmed that,

> (1) court reporters are county employees, (2) they transcribe
> court proceedings on their own time and as such that (3) they
> are free to charge any amount for transcripts, and (4) court
> reporters are not bound by any county standard for fees.

Given the exorbitant fee quoted by Brooke Wagner, the Plaintiff was

prevented from requesting the transcript for her court proceeding.

138. The Plaintiff alleges that she was vigilant for the Writ of

Possession from Defendant Bexar County.

139. The Plaintiff further alleges that she wanted to appeal the Writ.

140. The Plaintiff alleges that the Writ of Possession was never

posted. Instead, on January 22, 2014, a "NOTICE OF SURRENDERED /

SEIZED PROPERTY" was posted on the door to her apartment notifying

the Plaintiff that all her property had been placed outside the housing

complex. By the time that she returned home around 6 p.m. that night, all of

her property was gone. The Plaintiff "lost" all of her property.

141. The Notice also indicated that the Plaintiff's dog, a 12-pound terrier mix, had been taken to the shelter. She later learned that Lalito had been taken to the Defendant City of San Antonio's Animal Care Services ("SAACS") on 4710 State Highway 151, 78227.

142. Personnel at SAACS informed the Plaintiff that in order to retrieve her dog she would have to "microchip him." The Plaintiff refused to have her dog microchipped; she did not want any foreign elements inside her dog's body. Personnel provided the Plaintiff with a copy of Chapter 5, Article VII § 5-160(g) of the Defendant City of San Antonio's Municipal Code that read:

> At the time animals are reclaimed from the animal care facility they will be identified by the implantation of a microchip so the animal, if ever lost or stolen, can be returned to its owner.

The Plaintiff alleges that even when she explained that her dog was an "inside dog" with no record of being lost or stolen, she could not prevent her dog ("property") from being microchipped.

143. Moreover, the Plaintiff further alleges that even when she explained that she had been evicted from her apartment the day prior and could not afford the $94 in fees to reclaim her dog, no exception was made. The Plaintiff paid and was left with about $6 in her bank account.

144. The Plaintiff further alleges that the address 2404 S. Calaveras was located in Precinct 1 of Defendant Bexar County. Yet, Constable Val Flores and Deputy K. Mann #1294—the officers who executed the Writ on January 22, 2014—worked at Precinct 2.

145. Throughout the eviction proceedings—prior to Judge Ríos final judgment on December 12, 2013—the Plaintiff alleges she had always dealt with Precinct 1 and that the only time she dealt with Precinct 2 (7723 Guilbeau Road Suite 105, 78250) was when she was informed on the Notice of Surrendered/Seized Property that she had 30 days to pick up her wallet [with no money], empty purse, and three bottles of prescription medications (Allegra D, vitamin d, and ibuprofen), which had expired years earlier.

146. On June 29, 2017, the Plaintiff made a records request from Defendant Bexar County. In the paperwork that she received via USPS regular mail around July 13, 2017, she received a copy of the Writ of Possession that was not signed by a judge and did not include the specific date and time that the Writ would execute.

147. Interest on the money "owed" to the Defendant SAHA and the Defendant NRP Group, LLC continues to accrue interest.

148. The Plaintiff alleges that in addition to seeking teaching employment, she sought employment in other fields.

149. The Plaintiff applied to the Defendant City of San Antonio's Police Department. She was required to take a written and physical test. When the Plaintiff took the written test, she alleges that in many instances the questions and answers were vague and misleading. However, the Plaintiff was informed that she "barely passed" it. As such, she qualified to take to the physical test. She would have three opportunities within a specific time frame to pass it. One of those times, the Plaintiff also alleges, she witnessed how a tall and slender young man was filtered out of the police academy because he was not doing the sit-ups "correctly." The Plaintiff further alleges that she wanted to keep trying to pass the physical test but after some time, she desisted.

150. The Plaintiff also applied to Bill Miller Bar-B-Q Enterprises. She filled-out the paper applications and personally handed them to the managers at each restaurant throughout San Antonio. When she took her application to the manager at 3408 S.W. Military Drive, 78211, the Plaintiff alleges that he read-over her application and asked her "do you have any children?" After she replied that she had no children, the manager looked at her and asked "arrre youuu surrre?" The Plaintiff asked what that had to do with seeking employment. The Plaintiff further alleges that the manager answered, "if we hire someone with children, they'll always be calling off."

151. Due to the statements above, the Plaintiff has decided to file this class action lawsuit.

\*\*\*

152. The Plaintiff alleges that public and affordable housing in San Antonio is segregated to low-income communities in San Antonio.

153. Due to the statement above, the Plaintiff has decided to file this class action lawsuit.

## Part IV

154. When the Plaintiff was evicted from her apartment, she alleges that she "lost" her personal documents.

155. The Plaintiff alleges that confidential information pertaining to other individuals connected to her also was compromised.

156. The Plaintiff further alleges that she had archival data (visual and audio) related to her dissertation research. The data were of children and adults involved in the "Girl World" and "Girl Zone" afterschool programs at the Martínez Street Women's Center. Since the inception of the programs in 2001, thousands of children and adults have formed part of them.

157. The Plaintiff's loss of her dissertation and confidential research materials are irrecoverable as are the years she spent collecting the data, analyzing, and writing her qualitative study.

158. Due to the statements above, the Plaintiff has decided to file this class action lawsuit.

## Part V

159. The Plaintiff was hired as a 4th grade bilingual teacher at Hart Elementary School ("HES") with the Defendant Austin Independent School District ("Austin ISD") for the 2010-2011 school year.

160. The Plaintiff alleges that on October 21, 2010 she notified Leslie Dusing ("LD"), the Principal at HES, that she was having surgery on November 01, 2010. The Plaintiff further alleges that LD asked her to postpone her surgery until December and that they should have a conversation about it.

161. Sometime before her medical leave, the Plaintiff had the conversation with LD. The Plaintiff alleges that LD reiterated her request that the Plaintiff postpone her surgery. The Plaintiff further alleges that she told LD that she was in constant pain and could not postpone her surgery.

162. The Plaintiff alleges that Mrs. Stokes-Baker, another 4th grade teacher, recommended a long-term substitute teacher, who was certified in ESL, to teach the Plaintiff's students while she was on medical leave. The Plaintiff further alleges that she secured the long-term teacher; however, the Plaintiff later learned that LD opted for Marco Bustamonte-Brown, a temporary hourly employee who coached soccer, to teach the Plaintiff's students.

163. The Plaintiff left on her medical leave and returned the day prior to winter break.

164. Early in the school year, the Plaintiff alleges that administrators at HES informed teachers that if students did not pass or did not progress in their standardized assessments, that teachers had to "IMPACT them immediately." "IMPACT" stood for Instructional Model to Prepare Certified Teachers. The Defendant Austin Independent School District used this "model" to identify students as needing special education services.

165. The Plaintiff alleges that administrators and specialists at HES recommended that she IMPACT one of her students (Student A), who supposedly struggled with assessments in mathematics.

166. The Plaintiff alleges that she IMPACTed Student A. However, she did it to draw attention to the fact that Student A needed a hearing aid to

remediate the deafness in one ear. Until Student A received a hearing aid, the Plaintiff—as his teacher of record—could not conclude that he had a learning disability.

167.   Throughout the school year, the Plaintiff alleges that two of her students suffered from health-related issues. One of the students (Student B) informed her that she could not run the morning lap around the track because she had kidney problems. The Plaintiff learned about the other student's asthma (Student C) when her mother delivered the student's asthma medicine and paraphernalia directly to the classroom. The student had run the morning lap without complaint. After the Plaintiff learned of the student's asthma, the student no longer ran the morning lap. The administration and the school nurse never notified the Plaintiff about the students' medical conditions.

168.   The Plaintiff further alleges that early in the school year she had noticed that two of her students (Student D and Student E) were demonstrating learning difficulties and began anecdotal notes and modifications.

169.   The Plaintiff alleges that the first time she learned that one of these two students (Student D) was a Special Education ('SPED") student was when Alexandra Mendoza-Castañeda ("AM-C"), Assistant Principal,

43

informed her that she was attending his "ARD" (Admission, Review, and Dismissal).

170. Soon thereafter, Student D was transferred out of the Plaintiff's classroom without explanation. The Plaintiff alleges that she never saw him again and assumed that he transferred to a new school.

171. The other student (Student E) was promoted to the fourth grade but after being in the Plaintiff's class for a few weeks, the Plaintiff alleges that Student E was returned to the third grade. The Plaintiff further alleges that María Mayorga, Curriculum Specialist, explained that Student E had not passed his TAKS assessments and that he should not have been promoted to the fourth grade.

172. Student B was transferred from the Plaintiff's bilingual classroom to an ESL class. At Defendant Austin ISD, an "ESL class" is a pseudonym for a "monolingual English class," "mainstream class," or "general program class." However, the Plaintiff alleges that she—as the student's teacher of record—never attended the Language Proficiency Assessment Committee ("LPAC") meeting when the decision was made.

173. The Plaintiff alleges that a student (Student F) had commenced the school year in the ESL class in the adjacent room to the portable. He was then transferred to the Plaintiff's class with no explanation. The Plaintiff

44

further alleges that Student F had been demonstrating difficulty in math and there was a possibility that he was dyslexic. Just when the Plaintiff was about to commence anecdotal notes and modifications, the Plaintiff was ripped from her 4th grade students. This is elaborated further in this complaint.

174. The Plaintiff alleges that a student (Student G) was moved from her bilingual classroom to another bilingual classroom. The Plaintiff further alleges that she received no explanation for the decision.

175. The Plaintiff alleges that she later learned that many ARD and LPAC decisions also had taken place in the absence of the students' native Spanish-speaking parents.

176. The Plaintiff alleges that the majority of classroom time was spent on assessments and/or preparation for assessments: Beginning of Year (BOY), Middle of Year (MOY), and preparation for the Texas Assessment of Knowledge and Skills ("TAKS"). However, LEP students also had to do "TELPAS," the Texas English Language Proficiency Assessment System.

177. The Plaintiff alleges that students were constantly pulled-out of her class to meet with curriculum specialists. This interrupted both the teaching and learning in the Plaintiff's classroom. At times, specialists cancelled their meetings with students at whim.

178.    The Plaintiff alleges that administrators and specialists at HES manipulated the language of instruction to agree with the language of the test that students would take. They decided the language the students would test in by using scores on previously-taken standardized tests. LEP students could be exited from the bilingual program if she/he scored well on a practice test in English *and nothing else.*

179.    If a student was scheduled to take the test in English, then the Plaintiff alleges that she was expected to teach that student in English. If on the other hand, a student was scheduled to take the test in Spanish, then the Plaintiff was expected to teach that student in Spanish. The Plaintiff further alleges that this set-up was overwhelming for her and her students.

180.    Many assessments in Spanish were direct translations of their counter-parts in English. The Plaintiff alleges that many times, the translations were erroneous. There were grammatical errors and information that went missing in translation.

181.    When something in English was translated from English to Spanish, the reading level of the translation in Spanish was elevated. For instance, a text in English at a 4th grade reading level became a text in Spanish at a 6th grade reading level.

182. The Plaintiff alleges that she had no books and/or full-sets of books for her students. Even when she inquired about it to Alexandra Mendoza-Castañeda ("AM-C"), the Plaintiff never received them and/or was slow to receive them.

183. The Plaintiff alleges that she did not have an ESL program from which to teach ESL.

184. The Plaintiff further alleges that she did not have all of the manipulatives to teach math.

185. The Plaintiff alleges that her portable classroom was a hazard to her and her student's health. On October 17, 2010, Susane Smith ("SS"), Secretary at HES, told the Plaintiff to go home because the Plaintiff was coughing badly. The Plaintiff went to Texas MedClinic and was diagnosed with "reactive airway disease w/o status asthmaticus" and "allergic rhinitis nos." She received aggressive medication. The Plaintiff further alleges that she suffered from allergies when she lived in San Antonio, but those in October of 2010 were the worst that she had ever had.

186. After the third or fourth time that students vomited in class, the Plaintiff alleges that she informed SS that she wanted the classroom investigated for health hazards. She was especially concerned about the foul smell in the classroom.

187. On February 24, 2011, it was found that the roof needed replacing. Water was leaking and it was wetting the ceiling tiles. This explained why the ceiling tiles were stained and warped. It was also found that the filter in the electric furnace had not been changed in a long time; it was extremely filthy.

188. The administrators at HES purchased an air purifier for the classroom. The Plaintiff further alleges that on February 25, 2011, after the administrators instructed the Plaintiff to go home, the administrators had an indoor air quality assessment of the Plaintiff's classroom and the classroom on the other half of the portable.

189. The Mold Analysis Report on the Plaintiff's classroom included comments by Chris Paprick, Mold Assessment Consultant for the Defendant Texas Department of State Health Services, which were:

> windows had been open most of [the] day. [I] told [the] Assistant [P]rincipal to close [the windows and] turn [the] air condition[er] on. There is a[n] air [f]ilter machine [that was] [j]ust [b]ought for [the] classroom.

Prior to the Plaintiff being sent home that day, the air purifier had been on. It is unclear whether it was on while the Consultant collected the Indoor Air Quality (IAQ) sample. The sample was taken under all these conditions and sent to Environmental Analytical Services, LLC ("EAS") in Houston for analysis.

190. On March 1, 2011, Angela Kizzee, Environmental Safety Foreman for the Defendant Texas Department of State Health Services notified LD that the "Indoor mold levels appear acceptable. At this time, we do not recommend further air sampling."

191. On July 28, 2017, Arthur Hernández with EAS stated that the conditions in the portable affected the sample.

192. On March 03, 2011, DD sent all teachers and staff an e-mail informing them that

> There is a metal grate somewhere near the track. Please ask your kids to be cautious near this grate. A child fell earlier and was scraped up by this grate.

In that same e-mail, DD also stated, "A first grade child has made a claim that there was a stranger on the track earlier this week."

193. The Plaintiff alleges that HES was a segregated campus similar to CHES in NEISD. Instead of busing students to desegregate campuses, the Defendant Austin ISD bused low-income LEP and SPED students to HES to intentionally segregate them.

194. The intention to segregate students, the Plaintiff alleges, went so far that even when the campus was "bursting at the seams" with students, the Defendant Austin ISD added portable classrooms to accommodate them.

195. The Plaintiff alleges that by distinguishing between fact, fiction, and illusion, she attempted to "normalize" the teaching and learning experience in her classroom.

196. The Plaintiff alleges that she met with LD and DD in LD's office on a number of occasions. The first was on February 15, 2011 where LD and DD directed the Plaintiff that she had to follow the Writing Camp lesson plans. The Plaintiff further alleges that she had understood from the other 4th grade teachers that the plans were only a suggestion.

197. The Plaintiff alleges that the 4th grade lesson plans included those for Science. However, that was an illusion. Since returning from winter break, Math time had swallowed Science time. Science was not formally assessed in the 4th grade.

198. The Plaintiff alleges that she taught Science in her classroom and incorporated math whenever possible.

199. The Plaintiff alleges that in her classroom, reading and writing occurred *across the curriculum* and with real-life purposes beyond standardized tests.

200. The Plaintiff further alleges that she taught writing and the writing process in her classroom.

201.   Sometime in March of 2011, the Plaintiff alleges that the administrators at HES informed her that she would no longer be teaching her 4th grade bilingual students and that she needed to vacate the classroom of all her personal belongings.

202.   The Plaintiff alleges that the administrators at HES reassigned her as an Intervention Teacher for 1st and 2nd grade bilingual students, tutoring groups of 4-5 students at a time. She was also an Intervention Teacher for a 5th grade student from China.

203.   The Plaintiff was not certified to teach students in these capacities.

204.   Ultimately, the Plaintiff alleges that LD and DD terminated her based on false/unqualified allegations constructed to rid themselves of the Plaintiff. The following was their "assessment:"

> - Deficiencies pointed out in observation reports, appraisals or evaluations, supplemental memoranda, or other communications.
> - Failure to fulfill duties or responsibilities.
> - Incompetence or inefficiency in the performance of duties.
> - Inability to maintain discipline in any situation in which the employee is responsible for the oversight and supervision of students.
> - Insubordination or failure to comply with official directives.
> - Failure to comply with Board policies or administrative regulations.
> - Failure to maintain an effective working relationship, or maintain good rapport, with parents, the community or colleagues.

- A significant lack of student progress attributable to the educator.

205. In 2010-2011, the Plaintiff held a <u>Standard</u> Texas Educator

Certificate to teach the following:

- Generalist EC - 8
- Bilingual Generalist-Spanish EC - 8
  - Secondary Spanish 6 – 12
- English Language Arts and Reading 8-12
- English as a Second Language Supplemental

206. Leslie Dusing ("LD") held a <u>Provisional</u> Texas Educator

Certificate to teach the following:

- Elementary Self-Contained PK – 6
  - Bilingual/ESL PK-6

A provisional certificate is a temporary certificate.

The Plaintiff reviewed LD's university transcripts and she alleges that they do not demonstrate that LD was ever qualified to teach. At Defendant Austin ISD, LD taught Kindergarten Bilingual at Blanton Elementary School for <u>one year</u> (1996-1997). In 1996, LD held a <u>Probationary</u> Texas Educator Certificate. She resigned in 1997. LD was rehired in 2002 as Principal at Blanton Elementary. Records do not indicate that LD served as an Assistant Principal. In 2002, LD held a <u>Standard</u> Texas Educator Certificate as a Mid-Management Administrator PK – 12. Aside from

Blanton and Hart Elementary Schools, LD was also the Principal at Dobie

Middle School. She retired from the Defendant Austin ISD in 2015.

The Plaintiff also alleges that she never heard LD hold conversations

in Spanish.

207.    David Dean ("DD") held a Standard Texas Educator Certificate

to teach the following:

- Generalist EC - 8
- English as a Second Language Supplemental

The Plaintiff reviewed DD's university transcripts and she alleges that

when enrolled at Texas A&M University, DD took INST – 463 SEC LANG

METHOD ESL BIL. DD took one methods class. At Defendant Austin ISD,

DD taught 5th grade at St. Elmo Elementary School (2006-2007). In 2008,

DD was appointed Assistant Principal at Hart and Highland Park Elementary

Schools. At that time, DD held a Standard Texas Educator Certificate as a

Principal EC – 12. The Plaintiff alleges that DD taught for two years.

In August of 2010, DD was reassigned as Assistant Principal at Hart

and Cook Elementary Schools. In November of 2010, he was assigned 100%

at Hart Elementary School. In 2013, DD was appointed Principal at Hart

Elementary School. In 2015, DD was appointed Interim Principal at Burnett

Middle School. In 2016, DD was reassigned as Principal at Burnett Middle

School.

On June 20, 2016, Defendant Austin ISD terminated DD's Term

Contract for the following reasons:

> - Failure to comply with Board policies or administrative regulations.
> - Failure to meet the district's standards of professional conduct.
> - Behavior that presents a danger of physical harm to a student or to other individuals.
> - Any reason that makes the employment relationship void or voidable, such as violation of federal, state, or local law.
> - Any reason constituting good cause for terminating the contract during its term.

As of August 28, 2017, however, the Defendant Texas Education

Agency has not officially revoked DD's educator certificate. The certificate

online contains the link "Click here to go to EDUCATOR SANCTION

HISTORY section" and the note "This individual is currently under review

by the TEA Educator Investigations Division."

208.   Maria Mayorga ("MM") held a <u>Provisional</u> Texas Educator

Certificate to teach the following:

- Elementary Self-Contained 1 -8
- Elementary Bilingual/ESL 1-8

Once again, a provisional certificate is a temporary certificate.

During the 2010-2011 school year, MM was a "Curriculum

Specialist" for writing. MM, however, was not certified to teach as a

curriculum specialist for writing.

209.   Alexandra Mendoza-Castañeda ("AM-C") held a <u>Provisional</u> Texas Educator Certificate to teach the following:

- Elementary Spanish 1 -8
- Elementary Bilingual/ESL 1 -8
- Elementary Self-Contained 1 -8

Again, a provisional certificate is a temporary certificate.

The Plaintiff reviewed AM-C's university transcripts and found that when enrolled at the University of Texas – Austin, AM-C majored in APPL LEARN AND DEV/ELEM-SPANISH, BILING ED and a few of the courses she took were the following:

- ALD 325 SECOND LANGUAGE ACQUISITION
- ALD 327 SOCIOCUL INFLUENCES ON LEARN
- EDC F371 APPL LIN AND MTHDS IN ESL
- EDC 371 1-16.3-SPN LANG/MTHD BILIN TCH

AM-C began teaching with the Defendant Austin ISD in 1991 as a <u>4th</u> <u>grade bilingual teacher</u> at Metz Elementary School. AM-C was appointed Assistant Principal at Hart Elementary School in August of 2010. At that time, AM-C held a <u>Standard</u> Texas Educator Certificate as a Principal EC – 12. AM-C retired from Defendant Austin ISD in June of 2013. The Plaintiff alleges that AM-C taught from 1991 to June of 2010, gaining about 19 years of teaching experience in bilingual settings.

55

210. The Plaintiff alleges that AM-C informed the Plaintiff on October 1, 2010 that she was her official appraiser.

211. The Plaintiff alleges that LD made herself the Plaintiff's official appraiser in retaliation for the Plaintiff not IMPACTing students and for not postponing her surgery/medical leave as LD had requested. The Plaintiff had informed LD about it on October 21, 2010.

212. Prior to the Plaintiff going on medical leave, AM-C had informally evaluated the Plaintiff's teaching during math time and the Plaintiff alleges that AM-C gave the Plaintiff a favorable evaluation.

213. When the Plaintiff received her personnel file from Defendant Austin ISD around July 27, 2017, the evaluation by AM-C was not included.

214. On August 08, 2017, Melissa Sabatino ("MS"), Administrative Supervisor, Public Information and Strategic Programs, informed the Plaintiff that

The document[s] provided are all the documents maintained by the district in your Human Resources and Employee Relations files. The district maintains no additional documents regarding yourself.

215. The Plaintiff alleges that she was never officially notified that her employment with Defendant Austin ISD was terminated in accordance to Texas Education Code Section 21.103, which stated:

The board of trustees must give notice of its decision to
terminate the employment to the teacher not later than the 45th
day before the last day of instruction required under the contract
(Austin ISD Employee Handbook, May 2008, p. 47).

The Plaintiff alleges that in a letter that she reviewed with Beverly Stringer

("BS"), Supervisor of Employee Relations, on March 09, 2011, she learned

that the Board would decide to terminate or not terminate her on March 28,

2011.

216. On March 28, 2011, the only individual who was terminated

from employment at HES was Kimberly Berba. The Plaintiff's name appears

nowhere on the agenda for that Board meeting or any subsequent Board

meetings.

217. In an e-mail from BS to DD on April 13, 2011, BS wrote: "She

[Plaintiff] has already been terminated. The purpose of TINA [(Teacher in

Need of Assistance)], *should she return*, is to ensure that the needs of the

students are met" (emphasis added).

218. The Plaintiff received no contract renewal.

219. In the Notice of Termination of Probationary Contract dated

March 28, 2011 and addressed to the Plaintiff, Mark Williams, President,

Board of Trustees, wrote:

It was the judgment of the Board that the best interests of the
District will be served by terminating your employment. The

57

decision of the Board of Trustees is final and by State Law
[Education Code 21.103(a)] may not be appealed.

The Plaintiff alleges that the rights of teachers on Probationary Contracts are

violated as compared to teachers on Continuing Contracts and Term

Contracts. In 2011, teachers on Probationary Contracts were not afforded an

opportunity to contest and/or appeal the allegations against them.

220.  The Plaintiff alleges that she contacted Meria Carstarphen

["MC"], the then-Superintendent of Austin ISD, in late February 2011 to

complain that LD and DD were harassing her.

221.  The Austin ISD employee handbook instructed an employee

who had a complaint against her supervisor to contact the superintendent.

222.  MC never contacted the Plaintiff.

223.  The Plaintiff alleges that since the onset of the harassment in

February of 2011, she contemplated suicide twice.

224.  The Plaintiff alleges that she contacted Defendant Texas

RioGrande Legal Aid Inc. and was informed that they could not assist her

because her income was too high. Even when the Plaintiff explained that she

no longer had an income, Texas RioGrande Legal Aid Inc. did not provide

her with legal services.

225.  On August 22, 2017, the Plaintiff attempted to access public

records on Defendant Texas RioGrande Legal Aid Inc. with the Defendant

Texas Secretary of State. The Plaintiff went online and learned that in order to search the database, she needed a credit card. The Plaintiff does not have a credit card. She alleges that she contacted the Defendant Secretary of State via e-mail about an alternative to accessing public records but she received no response.

226. After the Plaintiff was terminated from Austin ISD, she qualified for unemployment benefits with the State of Texas.

227. The Plaintiff alleges that administrators at HES also harassed another bilingual teacher during the 2010-2011 school year. The teacher was given the same options as the Plaintiff, to resign or be terminated. The teacher decided to resign.

228. The Plaintiff further alleges that administrators at HES also harassed, forced to resign or terminated two bilingual teachers during the 2009-2010 school year.

229. Due to the statements above, the Plaintiff has decided to file this class action lawsuit.

## Part VI

230. After the eviction from her apartment, the Plaintiff was housed by two of her friends in San Antonio for about a week.

231. When the Plaintiff spoke with her friend in Chicago, she suggested for the Plaintiff to drive back home. At the time, the Plaintiff's car needed new tires and insurance. Driving to Chicago in the middle of winter would be dangerous.

232. The Plaintiff decided to leave her car in the driveway to the house that she and the Defendant Rita E. Urquijo-Ruiz, her ex-partner, co-owned, and she would return for it when it was possible.

233. The Plaintiff flew back to Chicago with her dog.

234. On March 31, 2014, the Defendant Rita E. Urquijo-Ruiz contacted the Plaintiff via e-mail to inform her that she needed "to contact Attorney Maria Salazar (mariasalazar@gmail.com) in order to resolve the issue of [the Plaintiff's] vehicle parked at ["the Defendant's"] house.

235. Back in 2005, the Defendant Rita E. Urquijo-Ruiz and the Plaintiff co-purchased the house at 3614 Windgap Drive, 78230. For the down payment, the Plaintiff alleges that both she and the Defendant used the proceeds from the sale of the Plaintiff's house in Berwyn, Illinois, 60402. The Plaintiff also alleges that she always contributed equally to the mortgage payment, house expenses, and bills.

236. On January 15, 2010, the Defendant A-TEX Roofing Inc. filed a lien for $10,132.50 on the property on Windgap Drive. The Defendant Rita

E. Urquijo-Ruiz and the Plaintiff's refused to pay A-TEX Roofing Inc. They alleged that the work on the roof had been performed unsatisfactorily by, what they later learned were, unlicensed subcontractors hired by A-TEX Roofing Inc. The Defendant and the Plaintiff signed the contract with A-TEX Roofing Inc.

237. When the Defendant Rita E. Urquijo-Ruiz purchased the house on Windgap Drive in 2005, the Plaintiff had a negative credit rating. The Plaintiff was not on the deed.

238. The Plaintiff filed for Chapter 7 bankruptcy and all her unsecured debt was eliminated in 2007. The Plaintiff alleges that while at the proceeding, Judge Leif M. Clark commented that Irma Rosas had accumulated the debt in Illinois and followed it with a condescending "good ol' Illinois." The Plaintiff already knew that she was no longer in Illinois and the judge's comment made it even more real.

239. The Plaintiff alleges that the Defendant Rita E. Urquijo-Ruiz illegally kicked her out of a house that she co-owned, occurring sometime in May or June 2010. The Defendant then illegally changed the locks.

240. The Plaintiff alleges that she visited the Defendant Texas RioGrande Legal Aid Inc.'s San Antonio office but was told that they could not assist her.

241. The Plaintiff alleges that she also went to Defendant Wells Fargo & Company Bank in San Antonio, TX to obtain copies of bank statements of her personal account and joint account with Defendant Rita E. Urquijo-Ruiz, but she was told they no longer had any of her records. Legally they were only required to keep them for 7 years. On September 6, 2017, the Plaintiff went to Wells Fargo & Company Bank in Westchester, IL and received a copy of the record of when she opened her personal account—although both were opened at the same time in 2004. When the Defendant and the Plaintiff separated in 2010, the 7-year time limit had not been met.

242. Months before the Defendant Rita E. Urquijo-Ruiz terminated her relationship with the Plaintiff, she had asked the Plaintiff to be a participant at a presentation at the Defendant Trinity University ("TU"). At the time, the Defendant was an Assistant Professor at TU. The presentation was related to the McNair Program at TU and the invitation would entail sharing one's experiences as a first-generation college student. While the Plaintiff was not a student at TU, she accepted to share her story. However, the Plaintiff later realized that the presentation would conflict with the dates the Plaintiff was scheduled to be in Denver, CO for the AERA conference.

The Plaintiff would be unable to attend the presentation and cancelled her participation.

243. The Plaintiff alleges that the Defendant Rita E. Urquijo-Ruiz later informed her that Magda García ("MG"), a master's student at UTSA, had accepted to participate. The Plaintiff further alleges that she questioned the Defendant why she had selected someone who was not a first-generation college student and why she insisted on inviting students from UTSA. The Plaintiff alleges that the Defendant simply shrugged her shoulders and walked away.

244. The Plaintiff now alleges that Defendant Trinity University did not have the first-generation population required to receive federal funding for its McNair Program.

245. When the Defendant Rita E. Urquijo-Ruiz contacted the Plaintiff on March 31, 2014, the Plaintiff alleges that she was still unemployed and could not afford to return to San Antonio to pick-up the car and buy new tires and insurance for it.

246. The Plaintiff requested a certified history of the car from the Texas Department of Motor Vehicles and she received it via e-mail on August 05, 2017.

247. That day, the Plaintiff learned that the Defendant Rita E. Urquijo-Ruiz had transferred the vehicle to the Plaintiff on February 11, 2014 and that the date of sale had been November 09, 2009. The Plaintiff alleges that the date of sale is untrue. The Plaintiff further alleges that the only reason why the Defendant was on the title was for car insurance purposes.

248. On June 15, 2017, the Defendant Texas Department of Motor Vehicles received the Defendant Rita E. Urquijo-Ruiz' "Application for Authority to Dispose of a Motor Vehicle to a Demolisher." The license plate number was written as BH9W278, which the Plaintiff alleges is wrong. In the Statement of Fact for an Abandoned Motor Vehicle, the Defendant Rita E. Urquijo-Ruiz stated: "My ex[-partner] abandoned this vehicle on Jan. 29, 2014 & I cannot locate her. Please see letter." The Plaintiff alleges that she did not abandon the car; she was still a co-owner of the property on Windgap Drive. She further alleges that the Defendant knew how to locate the Plaintiff through e-mail but chose to falsify information. The Defendant Texas Department of Motor Vehicles could not provide the Plaintiff with the "letter" that the Defendant submitted with the application.

249. According to the Texas Department of Motor Vehicles website,

"If the applicant applying for authority to dispose of the motor
vehicle is not the owner on record or does not have evidence

that ownership has been transferred to them, the department is required to make a notification to any owners and lienholders the department is able to identify by First Class Mail" (Retrieved on August 05, 2017 from http://www.txdmv.gov/motorists/buying-or-selling-a-vehicle/abandoned-vehicles).

On June 15, 2017, the Defendant Rita E. Urquijo-Ruiz was no longer the owner on record nor did she have ownership transferred to her. And, the Plaintiff alleges, the Defendant Texas Department of Motor Vehicles never notified her that the vehicle was going to be "junked" (occurring on July 14, 2017) and transferred to Claudio Alvarez (occurring on July 29, 2017).

250. Due to the statements above, the Plaintiff has decided to file this class action lawsuit.

## Part VII

251. On April 02, 2013, the Plaintiff was summoned to Jury Duty at Bexar County Courts.

252. That day, the Plaintiff and hundreds of other people were kept in a holding room for long hours. While she waited, the Plaintiff conversed with people. Other times, she just moved around and listened to people's conversations. The Plaintiff alleges that the main complaint was that people did not want to be because they "get more [earn more money by] going to work."

253. The Plaintiff alleges that by the time she was selected to possibly form part of a jury, she was exhausted.

254. Then while she waited with the other potential jurors outside of the courtroom, the Plaintiff further alleges that she overheard a woman saying that if she was chosen, that she was going to make sure that the others "decided quickly."

255. The Plaintiff alleges that she investigated and found out that "Texas law does not currently require that jury duty be paid, *except for those who are salaried exempt employees*..." (Retrieved from http://www.twc.state.tx.us/efte/jury_duty.html on September 8, 2017, emphasis added).

256. Due to the statements above, the Plaintiff has decided to file this class action lawsuit.

***

257. The Plaintiff attended the training to become a Bexar County Deputy Voter Registrar for 2013-2015 at 1103 S. Frio Street #100, 78207. When the Plaintiff walked to the training room inside the warehouse, she alleges that she saw hundreds of voting machines scattered haphazardly throughout the warehouse. They were not secured in any way to prevent tampering.

258. The Plaintiff was evicted from 2404 S. Calaveras in Bexar

County on January 22, 2014. However, on August 31, 2017 she learned that

she was still registered to vote at that address in Bexar County.

259. Due to the statements above, the Plaintiff has decided to file

this class action lawsuit.

## CLASS ACTION ALLEGATIONS

260. As authorized by Rule 23 of the Federal Rules of Civil

Procedure, Plaintiff brings this action on behalf of all other persons or

entities similarly situated throughout the United States.

261. The class of persons Plaintiff proposes to represent include:

All persons within the United States whom Defendants directly
or through any third parties, discriminated against them for
their U.S. citizenship, Chicana/o/x identity, LGBTQ identity,
low-income/unemployed status, and/or their Spanish language
identity within twelve years before this Complaint was filed
through the date of class certification.

262. Excluded from the classes is any Judge to whom this action is

assigned and any member of the Judge's staff and immediate family.

263. The proposed class members are identifiable through records

and databases.

264. The potential class members number in the tens of thousands, at

least. Individual joinder of these persons is impracticable.

265.    Plaintiff is a member of the class.

266.    There are questions of law and fact common to the Plaintiff and to the proposed class, including but not limited to the following:

a.      Whether the Defendants discriminated against the class in violation of section 1 of the 14th Amendment;

b.      Whether the Defendants' violations of section 1 of the 14th Amendment were negligent, willful, or knowing; and

c.      Whether the Plaintiff and the class members are entitled to compensatory and punitive damages as a result of the Defendants' actions.

267.    The Plaintiff's claims are based on the same facts and legal theories as the claims of all class members, and therefore are typical of the claims of class members.

268.    The Plaintiff is an adequate representative of the class because her interests do no conflict with the interests of the class, she will fairly and adequately protect the interests of the class, and, for now, she is representing herself on a *pro se* basis.

269.    The actions of the Defendants are generally applicable to the class as a whole and to the Plaintiff.

270. Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of class members, which will be ascertainable from records maintained by the Defendants and/or their agents.

271. The likelihood that individual class members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case, and given the small recoveries available through individual actions.

272. The Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

## LEGAL CLAIMS

### Count One:
### Violation of the 14th Amendment

273. The Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

274. The Defendants violated section 1 of the 14th Amendment by discriminating against them for their: (a) U.S. citizenship, (b) Chicana/o/x

identity, (c) LGBTQ identity, (d) low-income/unemployed status, and/or (e) Spanish language identity.

275. The Defendant's violations were negligent, willful, or knowing.

## Count Two:
## Injunctive Relief

276. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

277. The 14th Amendment authorizes injunctive relief to prevent further violations of the constitutional rights.

278. The Plaintiff respectfully petitions this Court to order the Defendants, and its employees, agents and independent contractors, to immediately cease engaging in violations of section 1 of the 14th Amendment.

## Relief Sought

For herself and all class members, the Plaintiff requests the following relief:

279. That the Defendants restrain from engaging in future actions in violation of section 1 of the 14th Amendment.

280. That the Defendants, their agents, and anyone acting on their behalf, be immediately restrained from altering, deleting, or destroying any documents or records that could be used to identify class members.

281.   That the Court certify the proposed class under Rule 23 of the Federal Rules of Civil Procedure.

282.   That the Plaintiff and all class members be granted injunctive, compensatory, and punitive relief as is just and equitable under the circumstances.

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

Plaintiff,
By *Pro Se*,

Dated: _____9·15·17_____          By: _____

Irma Rosas
Plaintiff
6333 S. Lavergne Ave.
Chicago, IL 60638
Telephone: (773) 627-8330
E-mail: irmarosaswebsite@gmail.com